Ashok Ramani (SBN 200020)
    ashok.ramani@davispolk.com
Philip T. Sheng (SBN 278422)
    philip.sheng@davispolk.com
Andrei Gribakov Jaffe (SBN 331921)
    andrei.jaffe@davispolk.com
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111

*Attorneys for Plaintiff Marked By Covid*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARKED BY COVID,<br><br>                    Plaintiff,<br><br>        v.<br><br>MARCOS LUTYENS<br><br>                    Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Marked By Covid ("MBC"), by and through its undersigned attorneys, for its Complaint against Marcos Lutyens ("Lutyens"), hereby alleges as follows:

## INTRODUCTION

1. COVID-19 has forever changed our lives. It has killed over one million people in the United States. Millions of others are still struggling to pick up the pieces and grieve the loss of loved ones. Mark Urquiza was one such victim of COVID-19. He died on June 30, 2020, in Phoenix, Arizona, leaving behind his life partner and their daughter. Mark's death inspired his daughter, Kristin, to cofound MBC, a nationally recognized nonprofit organization dedicated to honoring those who died from COVID-19 and helping loved ones cope with tragedy.

2. At issue in this lawsuit is MBC's rights in a one-of-a-kind memorial that Kristin Urquiza and others worked tirelessly to design and bring to life and that has served as a beacon for those impacted by the COVID-19 pandemic.

## NATURE OF THE ACTION

3. Under 28 U.S.C. § 2201, MBC brings this action for declaratory relief to protect its rights in an augmented reality memorial commemorating individuals lost to COVID-19 (the "Work").

4. Since early 2021, MBC and Lutyens worked closely to design the Work. As reflected in a Cooperative Agreement (attached as Exhibit A) signed by both parties in May 2022, MBC and Lutyens jointly authored the Work and both parties agreed that they would jointly own the Work. However, in the months leading up to the first display of the Work in October 2022, Lutyens sought to monetize the Work by selling related Non-Fungible Tokens. When MBC expressed to Lutyens that monetizing the Work was not its immediate focus and ran counter to the goals of the Cooperative Agreement, Lutyens grew increasingly difficult in the critical weeks leading up to the first display of the Work. This caused delays and forced MBC to incur additional costs.

5. Lutyens also delayed filing paperwork with the U.S. Copyright Office to register the copyright for the design of the Work on the parties' behalf. He then retained counsel and claimed, contrary to the Cooperative Agreement, that he is the sole author and sole owner of the

Work. Lutyens demanded that MBC cease displaying the Work unless it purchased a nonexclusive license from Lutyens.

6. Despite several attempts by MBC to resolve the matter informally, Lutyens' counsel sent MBC an email in April 2023 purporting to terminate the Cooperative Agreement and threatening MBC with claims of willful copyright infringement should it ever display the Work again. Lutyens' threats have imposed a dark cloud over MBC by severely limiting its ability to pursue its mission of honoring and memorializing those lost to COVID-19. MBC cannot, for example, display the Work at any future events without fear of retaliation from Lutyens, and his threats have affected MBC's ability to network and fundraise. For example, the State of New Mexico recently denied a $50,000 annual grant to MBC. The chair of the state's Memorial Steering Committee expressed concern over Lutyens' actions leading up to this dispute.

7. MBC asks the Court to confirm MBC's rights in the Work. MBC seeks a declaration that (1) it is a joint author of the Work, (2) it is a joint owner of the Work, and (3) as such, it is free to display the Work without Lutyens' authorization.

**PARTIES**

8. MBC is a 501(c)(4) California public-benefit corporation with its principal place of business at 5716 Corsa Ave, Suite 110, Westlake Village, CA 91362.

9. Based on information and belief, Lutyens is an individual and artist residing in Los Angeles, California.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction pursuant to 17 U.S.C. §101, et seq., 28 U.S.C. § 2201 and 28 U.S.C. §1338.

11. This Court has personal jurisdiction over Lutyens. On information and belief, Lutyens is a California resident. In addition, on information and belief, Lutyens (1) works and lives within the State of California, including in his role as an artist-in-residence at Fulcrum Arts, based in Pasadena, California; and (2) has solicited business in, transacted business within, and attempted to derive financial benefit from residents of this State, including within this judicial district by entering into the Cooperative Agreement with MBC and collaborating with MBC on

the design and display of the Work. The exercise of jurisdiction over Lutyens would not offend traditional notions of fair play and substantial justice.

12. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a significant portion of events concerning the creation of the Work, collaboration between MBC and Lutyens, and negotiations concerning rights in the Work occurred in this judicial district. MBC's principals also work and reside in this judicial district.

## FACTUAL BACKGROUND

13. The Work at issue is an augmented-reality 3-D sculpture comprised of two parts—a physical component that exists in the physical world, and a digital component that can only be viewed on a laptop computer or smartphone through the Snapchat app.

14. The physical component consists of a large circular plinth (i.e., a supporting base), at the center of which sits a raised structure in the shape of the city of Los Angeles that includes a silhouetted map of the city.

15. Using a camera on a laptop or smartphone, a user can scan the physical component using an application having the necessary augmented reality functionality, such as the Snapchat app, to activate viewing of the digital component on the user's screen. In this manner, the digital component comes to life and appears as an augmented-reality, slow-moving vortex consisting of the faces of individuals lost to COVID-19, including individuals from the local community from where the memorial is being displayed. Through the laptop or smartphone, a user can select any of the faces to pull up remembrances of the individual, such as family memories and stories that MBC collected and saved in its database.

16. A still image of the Work as displayed in October 2022, including the physical component and the digital component viewed through the Snapchat app, is shown below:



17. It took more than two years to design and create the Work, which MBC began in or around July 2020. Lutyens joined the effort in or around February 2021, about three months after MBC first met Lutyens in October 2020.

18. Lutyens regularly participated in online vigils held by MBC for the community to come together and discuss their feelings concerning the COVID-19 pandemic, grieve those who lost their lives, and support advocacy efforts on pandemic policy.

19. During this time, Lutyens worked on a project he called the Rose River Memorial, which consisted of temporary installations of collections of hand-made felt roses netted together to commemorate individuals lost to COVID-19. In December 2020, given Lutyens' shared interest in commemorating individuals lost to COVID-19, MBC and Lutyens began to informally collaborate on ideas on how to bring greater awareness to the COVID-19 pandemic.

20. In or around January 2021, MBC launched a public-policy platform to promote the establishment of local, state, and federal memorials for those lost to COVID-19. Kristin Urquiza ("Urquiza"), MBC's co-founder and co-executive director, discussed parameters for a national COVID-19 memorial during a panel discussion comprised of various experts in areas including memorial construction and design, non-profit fundraising, and public health.

21. In or around February 2021, MBC sought partners to co-design and create a model for the national COVID-19 memorial. Because of MBC's prior experience with Lutyens, MBC

approached Lutyens with its ideas.

22. After several meetings, MBC and Lutyens agreed in principle on several parameters concerning the memorial. Specifically, the memorial would not solely be a traditional physical installation, but instead would be comprised of a physical component that existed in the real world and a digital component that could only be viewed electronically. The physical component would consist of a platform or podium that would serve as the base of the digital component and as a landmark for community members to visit. MBC and Lutyens also agreed that the digital component would take advantage of augmented reality technology to enhance a user's experience and bring about a "wow factor," though the precise details were at that time still to be developed.

23. Urquiza also believed it important that community members affected by COVID-19 be a central part of the memorial. Urquiza believed that community members needed the opportunity to tell their stories in their own words to as many people as possible, and turning MBC's vision of a COVID-19 memorial into the national COVID-19 memorial would succeed only if the memorial showcased the stories of community members. Thus, Urquiza, made clear her view that the digital component of the memorial needed to include a feature that allowed users to select names of those lost to COVID-19 and view remembrances about them.

24. The parties also envisioned one day having a version of the memorial installed in cities and states across the country, at least one in each state. Specifically, each state could have its own version of the physical component that users could scan on their laptop or smartphone to activate the digital component and view the complete memorial. And the names of those lost to COVID-19 in the digital component could reflect individuals in the local community where the physical component was installed.

25. Through the spring and summer of 2021, MBC redoubled efforts to collect information from families who lost loved ones to COVID-19 for the purpose of including them as part of the National Covid Memorial (these efforts first started in or around July 2020). MBC also started to implement a fundraising and roll-out plan, which included reaching out to potential public and non-profit partners such as cities, states, non-profit organizations, and foundations, for

1 fundraising and displaying the memorial.

2     26.    Lutyens meanwhile had begun sketching different designs for the memorial that incorporated roses and drew inspiration from his Rose River Memorial project, which, on information and belief, he had pivoted away from due to lack of community interest.

    27.    Urquiza, in her capacity as a principal of MBC, directed Lutyens to incorporate two design principles that she believed must be included in the design of the memorial. First, she instructed that individual remembrances be a focal point. Second, she directed that the remembrances include the faces of those lost to COVID-19 next to the words from their bereaved family members.

    28.    During the summer of 2021, Lutyens provided several preliminary conceptual designs for the memorial that focused on a rose motif caved in metal. Below is a rendering of one of Lutyens' initial designs.



    29.    The principals at MBC rejected this design because it missed the mark on one of MBC's requirements: that individual remembrances be a focal point. It also did not include plans for a digital component. In addition, Urquiza was not satisfied with the cylinder-shaped design because in her view it evoked a feeling of heaviness.

    30.    Urquiza thus instructed Lutyens to replace the roses with faces of those who were lost to COVID-19. She also required that Lutyens change the cylinder to a spiral, which she believed would make it lighter. A spiral reminded her of an Arizona dust devil from her home

state, where she grew up with her father who was lost to COVID-19. A dust devil is a dust-laden vortex created when hot air rises from the ground through a pocket of cooler, low pressure above it. As the hot air rises, the cooler air fills the void left behind, forming a spinning vortex picking up dust and debris as it forms.

31. Lutyens' next proposal attempted to incorporate MBC's instructions. However, he also sought to retain a slightly modified cylinder-shaped design: a double-helix—two spirals in the surface of a cylinder that coiled around its axis, comprised of individual pictures of those lost to COVID-19 (instead of roses). Upon seeing this proposal, Urquiza reiterated that the chief design element needed to be a solitary spiral. Lutyens conceded and incorporated this specific design element.

32. Meanwhile, Lutyens also worked on the physical component of the memorial. Lutyens designed a large circular plinth that would have at its center a silhouetted map of the city where the memorial was located.

33. MBC was lukewarm to Lutyens' proposed design for the physical component. But, in the spirit of collaboration, it did not object to Lutyens' design because it had rejected many of Lutyens' other design choices, including the incorporation of roses, which MBC believed Lutyens strongly preferred due to his failed Rose River Memorial project.

34. After months of collaboration and trial and error, MBC and Lutyens provided a rendering of the memorial (as the design existed at the time) to MBC's contacts affiliated with the National League of Cities and the U.S. Conference of Mayors in hopes that the organizations would agree to display a prototype at their upcoming national conferences in November 2021 and Summer 2022, respectively. The National League of Cities and the U.S. Conference of Mayors

are national advocacy organizations. The rendering provided to these contacts is shown below:



35. In the spring of 2022, recognizing that so much time and effort had gone into the memorial thus far, MBC and Lutyens agreed it would be in their best interests to formalize their working relationship in a written agreement. Thus, in May 2022, MBC and Lutyens signed the Cooperative Agreement that formally documented the past work performed by MBC and Lutyens and mapped out the next steps. Among other things, the agreement correctly explained that Lutyens "[d]eveloped preliminary sketches and designs that have *shared copyright* with MBC" and stated that one of the next steps was to "[r]egister *our* design with the US Government copyright office." Exhibit A, at 1-2 (emphases added).

36. Around this same time, MBC began looking for a technology partner who could assist in the development of the digital component after Lutyens had failed to identify a suitable partner. MBC pitched Snap, Inc. ("Snap") on its vision to create a national COVID-19 memorial, and Snap agreed to provide pro-bono development support to MBC and assist in the development of augmented-reality functionality using its Snapchat app.

37. In July and August 2022, MBC was hard at work developing the digital component and further refining the design, but Lutyens was mostly unavailable. He had gone overseas to visit relatives, and then took a two-week pilgrimage in Peru.

38. In August 2022, MBC procured from Snap a $20,000 budget to cover the cost of displaying the Work in an October event celebrating the Dia de los Muertos holiday, which celebrates lost loved ones.

39. During Lutyens' absence, MBC worked closely with Snap to further refine the design proposed to the National League of Cities and the U.S. Conference of Mayors. MBC eliminated the central beam, and further refined the augmented-reality layers by directing a Snap developer to slow down the spiral movement and add embellishments. MBC also directed the developer to dial in other design elements that MBC initially suggested, including additional embellishments, font, size of photographs, line spacing of remembrances, speed of the vortex, and color.

40. The result was the design of the Work as shown above in paragraph 16. This was the design that was going to be displayed at the Dia de los Muertos event sponsored by Snap.

41. When Lutyens returned from Peru, his behavior toward MBC and the Work had changed. He began to communicate to MBC that he was worried about his own cash flow. Lutyens expressed an interest in launching a Non-Fungible Token project to monetize the Work. MBC explained that the display of the Work at the Dia de los Muertos event was meant only as a proof of concept to gauge the public's interest and to assess the augmented-reality technology. MBC further explained that, if successful, any media coverage, photos, and videos could be used to solicit funding for the purpose of finding additional opportunities to display the Work and to honor those affected by COVID-19. MBC and its principals were never motivated by personal financial gain.

42. Upon hearing this, Lutyens delayed filing paperwork with the U.S. Copyright Office to register the copyright for the design of the Work, despite agreeing to do so on behalf of the parties as reflected in the Cooperative Agreement. Ex. A at 2. This despite MBC offering to have counsel assist with the filings.

43. Despite these changes in behavior, Lutyens still participated in weekly coordination calls with MBC and Snap to plan out the upcoming Dia de los Muertos event. Lutyens, however, further disengaged from MBC. He would often skip the internal calls MBC tried to organize with him. Lutyens also stopped timely responding to emails and slack messages, updating tasks on Asana (a project-management software tool), and communicating to MBC his availability.

44. However, Lutyens continued to be a big proponent of the display of the Work at the Dia de los Muertos event. For example, the event was originally planned to take place at a location in San Francisco. However, the event coordinator unexpectedly passed away, and MBC and Lutyens discussed whether it made sense to cancel the event. Lutyens strongly pushed to continue with the event and found a new display location—the Hollywood Forever Cemetery in Los Angeles.

45. Leading up to the event, MBC agreed to be responsible for managing the press, website, social media, and other written materials. MBC also agreed, at Lutyens's request, to help create signs for the event. Lutyens provided an initial drawing for these signs, which MBC used to create the signs in collaboration with Snap.

46. MBC and Lutyens also agreed on talking points and a description of the project for public-facing communications about the Work: "The National Covid Memorial is Marked By Covid's interactive collection of photos and remembrances of those lost to Covid, powered by Snapchat's augmented reality (AR) technology and chronicled by those who loved them." MBC relied on these talking points for all communications leading up to, and including, the event date.

47. MBC made sure to credit Lutyens as a co-creator of the memorial in press outreach to reporters, social media posts, an e-mail list of 40,000 recipients, and other communications when discussing the creation of the memorial.

48. In addition, MBC encouraged Lutyens to speak at the press conference and write an "artist's statement," which MBC and Snap could feature in their communications. Lutyens declined both offers.

49. An hour before the event, Lutyens for the first time expressed his belief that he was not receiving sufficient credit for the Work, despite the parties having agreed on talking points and MBC crediting Lutyens as a co-creator in press outreach, social-media promotion, emails, and more.

50. Specifically, Lutyens complained that the event signs omitted his name. MBC was surprised because Lutyens provided the drawing of the signs to MBC and he did not include his name in these drawings. In addition, Lutyens had not expressed any concern when the same signs

COMPLAINT
Case No.

had been used at a press conference for the event 48 hours earlier.

51. Immediately after the event, Lutyens also complained that several captions of pictures taken from the event omitted his name. Specifically, MBC had coordinated and paid for a Getty Images photographer to cover the event, and one of the photographer's captions did not include Lutyens' name. Although not required to, MBC promptly approved Lutyens's request to have the text changed to say that the "National Covid Memorial" was "co-created by Marcos Lutyens." Lutyens then reached out to the photographer to request the correction.

52. Lutyens' behavior toward MBC then took a turn for the worse. In December 2022, Lutyens retained counsel and communicated to MBC that he asserted sole authorship and all rights in the Work. The letter incorrectly declared that "Mr. Lutyens was the artist that exclusively developed the idea of and created all associated plans, designs, and all other aspects of the Work."

53. MBC was disappointed by Lutyens' attempt to ignore all of MBC's hard work and collaboration with Lutyens. It tried to resolve the matter informally with Lutyens, but in April 2023, Lutyens sent a cease-and-desist letter demanding that MBC stop displaying the work and claiming that any further displays of the Work would subject MBC to damages for willful copyright infringement.

54. Although Lutyens' threats are not well-founded, his actions and threats have interfered with MBC's ability to display the Work and have strained relationships with funders and potential clients.

55. Thus, MBC seeks the Court's intervention to declare the parties' rights.

# COUNT I

## (Declaratory Judgment)

56. MBC re-alleges and incorporates by reference the allegations in paragraphs 1-55 above.

57. The parties' positions are conflicting—Lutyens asserts sole authorship and ownership of the Work, while MBC contends it is a joint author and joint owner of the Work as supported by the evidence, including a Cooperative Agreement signed by Lutyens. These positions, by virtue of Lutyens' threats of infringement, are actual, immediate, and substantial, and a justiciable controversy exists over the parties' respective rights and obligations.

58. MBC has no adequate remedy at law.

59. MBC is therefore entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 that MBC (1) is a joint author of the Work, (2) is a joint owner of the Work, and (3) is free to display the Work without Lutyens' authorization.

## PRAYER FOR RELIEF

WHEREFORE, MBC respectfully requests that this Court enter judgment in its favor and against Lutyens and grant the following relief:

a. Declaring and adjudging that MBC (1) is a joint author of the Work; (2) is a joint owner of the Work; and (3) may display the Work without Lutyens' authorization;

b. Awarding reasonable costs and expenses incurred in this action, including attorneys' fees;

c. Awarding any other relief the Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

MBC hereby demands a jury trial.

Dated: June 2, 2023

                                          Respectfully submitted,

                                          DAVIS POLK & WARDWELL LLP

                                          By:  */s/ Ashok Ramani*
                                                     Ashok Ramani (SBN 200020)
                                                     ashok.ramani@davispolk.com
                                                   Philip T. Sheng (SBN 278422)
                                                   phil.sheng@davispolk.com
                                                   Andrei Gribakov Jaffe (SBN 331921)
                                                   andrei.jaffe@davispolk.com

                                          1600 El Camino Real
                                          Menlo Park, California 94025
                                          Telephone: (650) 752-2000
                                          Facsimile: (650) 752-2111

                                          *Attorneys for Plaintiff Marked By Covid*

COMPLAINT
Case No.